UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, Plaintiff, | ) | File No. 25-cr-38 (SRN/DLM) |
| vs. | ) | Courtroom 6B<br>St. Paul, Minnesota<br>September 9, 2025<br>9:14 a.m. |
| Raymundo Olalde-Nieves, Defendant. | ) | |

---

BEFORE THE HONORABLE DOUGLAS L. MICKO
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(CRIMINAL MOTIONS HEARING)**

**APPEARANCES**:

For the Plaintiff: United States Attorney's Office
David B. Green, AUSA
600 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

For the Defendant: Arneson Law Office
Wyatt Arneson, ESQ.
400 South 4th Street
Suite 1025
Minneapolis, MN 55415

Court Reporter: Lynne M. Krenz, RMR, CRR, CRC
Suite 146
316 North Robert Street
St. Paul, Minnesota 55101

Spanish Interpreter: Esperanza Lopez-Dominquez

Proceedings reported by certified stenographer; transcript produced with computer.

# I N D E X

| | PAGE |
|---|---|
| **CONNIE GERTEN** | |
| Direct Examination by Mr. Hollenhorst | 9 |
| Cross-Examination by Mr. Arneson | 27 |
| **ANTHONY MAINS** | |
| Direct Examination by Mr. Hollenhorst | 33 |
| Cross-Examination by Mr. Arneson | 51 |
| Redirect Examination by Mr. Hollenhorst | 60 |
| Recross Examination by Mr. Arneson | 63 |
| **PATRICK BEUNING** | |
| Direct Examination by Mr. Hollenhorst | 65 |
| Cross-Examination by Mr. Arneson | 82 |

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendant present)

THE COURT: We are here this morning in the matter of United States versus Raymundo Olalde-Nieves. It's Court File Number 25-cr-38 and we are here for a motions hearing.

I see we have an interpreter with us, so before we get started I'll swear in our interpreter.

(Interpreter sworn)

THE INTERPRETER: I do, Your Honor.

THE COURT: Thank you.

And with that, I'll get appearances from counsel, starting with the government.

MR. HOLLENHORST: Good morning, Your Honor. Tom Hollenhorst for the United States. And seated with me here is Special Agent Connie Gerten from the DEA. And I have my two witnesses back here. The defense requested sequestering, so you guys have to stand outside.

Thank you, Your Honor.

THE COURT: Okay. Thank you. And good morning to each of you.

And how about on behalf of Mr. Olalde-Nieves.

MR. ARNESON: Good afternoon, Your Honor. Wyatt Arneson on behalf of Mr. Olalde-Nieves, who is present to my left.

THE COURT: Good morning to both of you as well.

THE DEFENDANT (Through Interpreter): Good morning. Good morning.

THE COURT: Folks, as I said, we're here for a motion hearing. As I have it, there is a government's motion for discovery filed at Docket Number 14 and a defense motion to suppress evidence that's filed at Docket Number 27.

I'm assuming that neither side wants to be heard on the motion for discovery; is that right, Mr. Hollenhorst?

MR. HOLLENHORST: Correct, Your Honor.

THE COURT: Mr. Arneson?

MR. ARNESON: Correct, Your Honor.

THE COURT: On the motion to suppress, it's my understanding that the government intends to proffer some -- well, to offer some evidence by way of exhibits and also have to have live witness testimony; is that right, Mr. Hollenhorst?

MR. HOLLENHORST: Yes, Your Honor.

THE COURT: Okay. Mr. Arneson, just as a housekeeping matter, have you had an opportunity to review the exhibits that Mr. Hollenhorst has proffered before today's hearing?

MR. ARNESON: Yes, Your Honor.

THE COURT: Any objection to any of those?

MR. ARNESON: No, Your Honor.

THE COURT: All right.

Do you want to offer those for purposes of our hearing today, Mr. Hollenhorst?

MR. HOLLENHORST: Yes, Your Honor.

The government would move to offer Government's Exhibit 1, 2, 3, 4, and 5.

THE COURT: And without objection, those will be admitted for purposes of our hearing today.

With that, let's turn to our witnesses.

Mr. Hollenhorst, does the government have witnesses to call as it relates to the motion to suppress?

MR. HOLLENHORST: We do, Your Honor.

And just as a summary of what we're going to do today, maybe this will help the Court a little bit.

THE COURT: And make sure that our interpreter is able to pick up what you're saying there too.

MR. HOLLENHORST: I think she is.

So we're going to call Special Agent Connie Gerten and she's the DEA case agent. The purpose of her testimony is to establish, in our view, probable cause to have stopped and searched the vehicle at issue here which led to the seizure of approximately 54 pounds of methamphetamine.

Next, we're going to call Trooper Anthony Mains who was assisting the law enforcement team in this case.

And Ms. Gerten asked Mains to make a traffic stop of the vehicle and Mains noted a seatbelt violation and that was the basis for the -- pretextual basis for the stop.

That led to some routine questioning which the government believes was suspicious and we'll have a little bit of that testimony.

That was then was followed by a dog sniff by Patrick Beuning who ran his dog around the car. It's kind of an interesting dog sniff because the dog almost immediately stuck its head through the window, open window of the car, which called into question whether or not that was a dog sniff that exceeded the authority of a dog sniff.

But the Trooper's going to testify that just seconds, if not milliseconds, before that dog entered the car with its head that it had already alerted. And, of course "alert" is the biological indications of a dog, whereas the indication is the trained response. The dog did ultimately "indicate" but it was after it had stuck its head through the window several times.

So the defense focuses on that.

THE COURT: And, you know, I suppose we can get to this in briefing but as long as you're talking about it, Mr. Hollenhorst, one of the things that I was curious about when I read the papers on this is, you know, if the dog is sticking in its head in the window but my understanding was

that the contraband was found in the trunk, even if there's an exceeding the scope of a permissible dog sniff if there's any remedy because there's no -- I don't think there's any evidence in the cab of the vehicle to suppress.

MR. HOLLENHORST: I believe there was a small user quantity --

THE COURT: Oh, I see.

MR. HOLLENHORST: -- in the cabin.

THE COURT: I see.

MR. HOLLENHORST: And it's entirely possible the dog alerted to that, but we do have -- so those are two theories.

We're going to rely principally, though, that there's probable cause to have searched the car from the get-go.

But there's also an inventory search prong to all of this too, so we're going to talk about that.

THE COURT: Okay. Sounds fine.

MR. HOLLENHORST: Thank you, Your Honor.

THE COURT: Whenever you're ready, call your first witness.

MR. HOLLENHORST: Okay. And one final thing is Agent Gerten, being as detailed as she is, prepared a summary sort of some dates and times to give a sequence of events here. We've made a copy of those notes and provided

them to the defense as *Jencks* material.

With the Court's permission, and I don't think there's any objection, Ms. Gerten is going to bring those notes up with her and may from time to time refer to them only to make sure she's got the dates and times correct.

THE COURT: Mr. Arneson, any objection to that?

MR. ARNESON: No, Your Honor.

THE COURT: Okay. That's fine by me.

The only thing I would ask Agent Gerten is that when you're doing that if you could just say out loud that you're doing that so that the record reflects when you're, you know, relying on your notes and when you're testifying from memory.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

MR. HOLLENHORST: With that, Your Honor, the government does call Special Agent Connie Gerten.

THE COURT: Before you sit down, let me swear you in, Agent Gerten.

Do you swear or affirm that the testimony you're about to give is the truth and the whole truth?

THE WITNESS: I do.

THE COURT: Okay. Please have a seat.

And if you could state your full name and spell your last name for the record.

And then, Mr. Hollenhorst, whenever you're ready after that.

THE WITNESS: Connie Gerten, C-O-N-N-I-E, G-E-R-T-E-N.

MR. HOLLENHORST: Thank you, Your Honor.

**(Connie Gerten)**

**DIRECT EXAMINATION**

BY MR. HOLLENHORST:

Q. Where do you work, Ms. Gerten?

A. I work for the Drug Enforcement Administration.

Q. And what is your position there?

A. I'm a Special Agent.

Q. How long have you worked for the DEA?

A. Approximately 16 years.

Q. What is the general nature of your duties?

A. I investigate large-scale drug-trafficking organizations.

Q. Are you familiar with the facts and circumstances concerning the arrest of an Raymundo Olalde-Nieves on August 22nd?

A. I am.

Q. And that happened in 2024; is that right?

A. Correct.

Q. And you were at least observing the arrest of the defendant at the time?

A. I was not on the scene but I was in coordination.

Q. Okay. And who were two of the people you were coordinating with as part of your arrest that day?

A. We were working in coordination with Trooper Mains and Trooper Beuning.

Q. Both of whom are going to testify today?

A. Correct.

MR. HOLLENHORST: And, Your Honor, we're going to rely on repeated knowledge for some of this.

BY MR. HOLLENHORST:

Q. So would you say that you were collectively part of the law enforcement team that day?

A. Yes.

Q. All right. So just a few things about the arrest and then we're going to back up a little bit.

But on that date, and I think I have the date right, August 22nd, correct?

A. 2024, yes.

Q. Yes. Ultimately the car that the defendant was operating as the sole occupant was searched and about 54 pounds of methamphetamine were seized from the trunk of that car; is that right?

A. That is correct.

Q. And can you describe how they were seized -- what they were in? What they were contained in?

A. They were contained within four, five-gallon buckets.
Q. Okay. Which were sealed at the top?
A. Yes.
Q. All right. Or at least covered?
A. Covered.
Q. All right. So let us now back up.
And I would direct your attention to early June 2024. What happened in connection with this case on that date?
A. Okay. This is an ongoing investigation, it's been going on for over two years. In the course of this investigation, we had received some information about Sergio Marin-Gamino.
We -- in the course of my investigation we developed a confidential source who was communicating with a Mexico-base source of supply. This Mexico-base source of supply is a female, of which the CS knew, worked with and coordinated with Mr. Marin-Gamino.
The CS and the Mexico-base source supply coordinated, arranged, a one-pound methamphetamine deal in exchange for $1,700.
In the course of this transaction, the CS was put in contact with Mr. Marin-Gamino, at which point we had obtained a court-authorized GPS for his telephone and had arranged the drug transaction to occur on June 5th of 2024.
Q. What happened on June 5th, 2024?

A. The CS had provided the -- Mr. Marin-Gamino's home address of 711 Penn Avenue in Minneapolis. We established surveillance at that location. Observed Mr. Marin-Gamino exit -- well before that, he had passed the CS to -- pardon me, passed the CS the address or location of 14th and 28th Street in Minneapolis as where they were to meet. This was significant to me because we had already identified a location at 1403 East 28th Street in Minneapolis as being a suspected stash house location for the organization.

At this time Mr. Marin-Gamino entered, at this time he was driving a Nissan Sentra, and traveled to 1403 East 28th Street and parked in the driveway.

Our CS then traveled to the same location. Met him in the parking lot. He, Mr. Marin-Gamino, walked up to the CS's vehicle, provided the one pound of methamphetamine and the CS provided the 1700 in government funds. And that exchange occurred in the parking lot and then Mr. Marin-Gamino eventually traveled back home.

Q. Were the drugs analyzed and determined to be methamphetamine?

A. They were.

Q. Okay. So this led to a search warrant of that stash house location on June 14th; is that correct?

A. That is correct.

Q. Could you describe that.

A. Yep. We received a Court-authorized search warrant of 1403 East 28th Street. There was a basement apartment below the normal house part where we located approximately seven-and-a-half pounds of methamphetamine. There was indicia indicating with Mr. Marin-Gamino's information in the basement.
Q. Okay. Now, at this point no efforts were made to arrest Mr. Marin-Gamino; is that correct?
A. Not at this time.
Q. Okay. And the court reporter's wondering how to spell this. It's M-A-R-I-N, dash, G-A-M-I-N-O; is that correct?
A. That is correct.
Q. And his first name is Sergio?
A. Sergio.
Q. S-E-R-G-I-O.
A. Correct.
Q. Okay. So let's jump ahead about six weeks.
Did something else happen on August 2nd, 2024, concerning Mr. Marin-Gamino?
A. Well, at this time we had developed a second confidential source. This confidential source was now communicating with a second Mexico-base source of supply, who was a male, and that's how I differentiate them in my brain. So the CS was communicating with this Mexico source.
On August 2nd of 2024, the Mexican source sent

the CS a video that contained suspected methamphetamine located in the black totes, so a large quantity. Impossible to know the exact amount, but a large quantity.
Q. And these appeared to be the same totes or five-gallon barrels that were subsequently -- oh, no.
A. No.
Q. Okay.
A. These are different.
Q. Okay. So then --
A. Same packaging but not the same container.
Q. Okay. And then what happened in response to that video?
A. Okay. Then on August -- I'm going to look at my notes real quick to get the dates right.

So in the course of August, maybe a little previous, the CS and Mexican source are starting to have discussions about a larger methamphetamine deal. They had discussed a 56-pound methamphetamine transaction.

In the course of their discussions they decided to break it down into two because they had never worked together prior. They were going to do an initial two-pound methamphetamine deal and then follow up with a larger methamphetamine deal.

So on August 13th of 2024 the CS was communicating with the Mexican source, who then passed the

CS a telephone number. The CS then began communicating with that telephone number in which they were coordinating the two-pound methamphetamine deal.

Q. Is this unusual for a deal to be broken up in this manner?

A. No, not necessarily. Especially since they have never worked together previously it's common for them to do a smaller deal to get acquainted, meet each other and make sure that everything's Kosher.

Q. Okay. So then what happened as we follow the story?

A. Okay. And then -- so the CS began communicating, who was later identified as Mr. Marin-Gamino, was the user of the telephone number. We also got Court-authorized GPS on that telephone and it was geolocating in the vicinity of 711 Penn Avenue, so that further corroborated our belief.

Q. And that was Mr. Marin-Gamino, again, who was communicating with a different CS?

A. Correct.

Q. Okay.

A. Yes. So we then we established surveillance and in the area of 711 Penn Avenue. Mr. Marin-Gamino provided the CS with a location in Golden Valley as where they should meet for this deal to be conducted. Mr. Marin-Gamino also provided the CS with the vehicle -- no, I take that back. That wasn't that deal. Strike that.

We conducted surveillance. Mr. Marin-Gamino got into a Dodge Caravan and traveled to the location in Golden Valley in which they met the CS.

They then met in the parking lot and the CS was provided the two pounds of methamphetamine and Mr. Marin-Gamino was provided the $3,400 in government funds.

Q. And those drugs have come back positive for methamphetamine as well?

A. They have.

Q. Okay.

A. What was also -- flip the page.

What was significant about they had additional conversation in the course of that -- in the course of that drug transaction where Mr. Marin-Gamino told the CS that when the CS was ready, they were ready, being the organization, Mr. Marin-Gamino, was ready to provide the additional 50-plus pounds of methamphetamine.

They also discussed that Mr. Marin-Gamino had large quantities of methamphetamine in buckets that were stored somewhere, we didn't know where.

I'm going to refer to my notes one more time.

Oh, they discussed also that when the CS was ready they would meet at a building in either Brooklyn Park or Brooklyn Center for the transaction because he had a friend that cleans at that building.

Q. Would you -- well, I'm going to just ask you to describe what happened next.

A. Okay. Then on August 14th of 2024, we got a Court-authorized GPS tracker for Marin-Gamino's Dodge Caravan.

Then on August 22nd of 2024, the CS reached out to Mr. Marin-Gamino on the original telephone number to further -- or ask for the additional 54 pounds of methamphetamine.

At this time that telephone number was no longer in service and the CS had to reach out to the Mexican source, who then passed a new telephone number to the CS, of which the CS then contacted, who again confirmed, was Mr. Marin-Gamino's new telephone number.

Q. And you were working with the first CS and the second CS all along the way here; is that right?

A. Correct.

Q. And --

A. The second CS was with a little bit newer. The other CS was more longer.

Q. Okay. So then after it was confirmed that Mr. Marin-Gamino was using this new phone, what happened?

A. They communicated and the CS asked if they would be able to conduct the additional 54-pound --

THE COURT: Let new interrupt you just for a

second, Ms. Gerten, just because I think it would be nice to have clarity about this.

Can you differentiate in your testimony between what CS you're talking about for these different events?

THE WITNESS: Sure. CS2, would that be fine?

THE COURT: Okay. Yes.

MR. HOLLENHORST: And, Your Honor, just for clarification, and if the witness can confirm.

BY MR. HOLLENHORST:

Q. So the CS1, which we can call him or her as one --

A. Yep.

Q. -- was dealing with the transaction in June and then was out of it, right?

A. Then was out, yes.

Q. And so CS2 then picked up the slack in August?

A. In August all came from CS2's information, yes.

Q. Thank you.

A. Thank you.

Q. All right. So then what happened then?

A. Okay. So CS2 communicated with Mr. Marin-Gamino asking if they can conduct the 54-pound deal that day on August 22nd. Marin-Gamino confirmed that that was possible.

I'm going to refer to my notes again.

Q. And now if you can give some times as well, because all of what you're going to say now happened on August 22nd,

correct?
A. Correct.
Q. Okay.
A. Okay. So Mr. Marin-Gamino stated to the CS that he would provide him or her a address in Brooklyn Park when the CS was ready or in the area, because at this time the CS stated that they were not quite to the Twin Cities area.

Mr. Marin-Gamino then texted the CS an address of 8517 Zane Avenue North in Brooklyn Park as the meet location for this transaction to occur.

Then Mr. Marin-Gamino left his residence at 711 Penn Avenue, which surveillance was already established on.
Q. Was that at about 8:45 a.m.?
A. That was at, if I'm looking at my notes, about 1:13 p.m.
Q. Oh, okay, okay. So let's start with that timeline then. The 1:13 p.m. --
A. The text message was sent at 12:58 p.m. and then Mr. Marin-Gamino left -- can I just state upfront all these times are approximate?
Q. Okay.
A. In case I forget to say that.

At approximately 1:13 he left in the Dodge Caravan and he was the sole occupant.
Q. Okay. What happened next?

A. We then had surveillance established at approximately 1:25 p.m. at the 8517 Zane Avenue location. As Mr. Marin-Gamino was making his way towards that location, he began to drive erratically, go around in circles, go into parking lots, go up and down the street. We believe this was countersurveillance and at this time agents were starting to believe that he had probably identified surveillance.

Q. Okay. Then what happened then?

A. Then at this time -- around that time frame, Mr. Marin-Gamino communicated with the CS and said a little bit of a change of a plan. That he would -- the CS would be now would be now meeting with a third-party without Mr. Marin-Gamino present. And he used a term "moscas," which is flies, to keep the flies away, which was what we believe coded language to be not to bring the police to that location.

Let's see. I'm referring to my notes.

When Mr. Marin-Gamino changed the location and kind of -- not changed the location, changed who they would be meeting -- the CS would be meeting with, the CS reached out to the Mexican sources of supply, because this was abnormal for the change, and the Mexican source of supply said it was for safety reasons, and so we continued with the deal.

At approximately 2:25 p.m. Mr. Marin-Gamino via telephone told the CS that the CS would be meeting with a gray Chevy Malibu.

At approximately 2:34 p.m. surveillance units that were monitoring the 8517 Zane Avenue location observed a gray Chevy Malibu drive into the lot, park at the north end. At one time the unknown person later identified as Mr. Olalde-Nieves.

Q. That is the defendant sitting in the courtroom today?

A. Correct.

Q. Okay.

A. Exit the Malibu and opened the trunk of the vehicle. They shut the trunk. Went back to the driver's seat. And then Mr. Olalde-Nieves got out again, walked to the back of the building.

Then at approximately 2:45 p.m. Mr. Olalde-Nieves went back to the Malibu, opened the driver's door, shut the driver's door, and then opened the trunk again, and then shut it.

At approximately 2:42 p.m. the Mexican source talked to the CS and confirmed that the guy had the merchandise. Merchandise we took as coded language to refer to as the methamphetamine.

Q. Did the source of apply ever mention that it was a Malibu, a Chevy Malibu?

A. I cannot -- I do not recall.
Q. Okay. What happened next?
A. Mr. Marin-Gamino communicated with the CS and let the CS know that the guy at the location was waiting for him.
At approximately --
Q. Can I interrupt you there?
A. Sure.
Q. I haven't asked you this before, I hope I don't surprise you with it, but given that there apparently was a change of plan, that Gamino -- or that Mr. Marin-Gamino was now no longer going to deliver the merchandise, did you or the agents have a theory as to how the drugs ended up in this other car?
A. My belief was that they were always going to meet with Mr. Olalde-Nieves and Mr. Marin-Gamino. The change of plan was now that Mr. Marin-Gamino was not going to be present.
Q. Okay. But that -- that's your surmise?
A. Yeah, that's my belief.
Q. All right. So then what happened then?
A. At approximately 2:57 p.m. a Minneapolis marked police unit went into the lot of 8517 Zane Avenue North in Minneapolis.
Q. Was that intentional?
A. Yes.
Q. Was that part of the plan?

A. It was part of the plan.
Q. Why did you do that?
A. We wanted the gray Malibu to leave the parking lot to be able to make a traffic stop on the vehicle.
Q. Okay. What happened next?
A. The CS communicated with Mr. Marin-Gamino stating that there was a marked unit and did not feel comfortable conducting the transaction in the lot.
Initially Mr. Marin-Gamino tried to talk the CS into conducting the transaction in the back of the building. The CS resisted and didn't feel comfortable with the marked unit, so Mr. Marin-Gamino --
Q. At least that's what he said?
A. That's what he said, yes, yes.
Mr. Marin-Gamino approved of the location change but then a few minutes later called back and then actually confirmed that the location -- location was being changed. I believe that was meant that he had now communicated or somebody communicated with the driver of the Malibu and that location change was officially approved.
Q. What happened right after that call?
A. Sorry. At this time in the lot, at approximately 3:47 p.m., Mr. Olalde-Nieves was on the telephone. He walked back to the Malibu, got in the Malibu and began to drive. He --

Q. Okay. And did that further confirm your suspicion that someone had communicated with Olalde to go to a new location?
A. Correct.
Q. Okay. What happened after that?
A. He turned north on Zane Avenue, which was in direction of the Hy-Vee. I don't know if I mentioned -- did I mention the Hy-Vee?
Q. Yeah, what was the new --
A. Sorry. The new location. The CS had suggested to Mr. Marin-Gamino that they change the location to the Hy-Vee in Brooklyn Park.
Q. Is that 9509 Zane Avenue North?
A. Correct.
Q. So ten blocks or so away?
A. Yes, that sounds about right.
Q. Okay. And then so you're saying that law enforcement saw Olalde drive the Malibu out of the lot towards that direction?
A. Correct.
Q. Okay. What happened after that?
A. At that time Trooper Mains observed a violation and construct -- and conducted a traffic stop.
Q. Okay. And you communicated -- did you communicate directly with Trooper Mains?

A. Yeah, I did. And he was on the radio. We all were sharing the same radio channel.
Q. Okay. And so you're aware then that Trooper Mains did, in fact, make a traffic stop and we're going to call him next to testify what happened during this stop; is that right?
A. Correct.
Q. And ultimately then he and Trooper Beuning, B-E-U-N-I-N-G, searched this vehicle, this Malibu, and found the approximately 40 --
A. 54.
Q. 54 pounds of methamphetamine?
A. Yes. And that was significant because that equated to exactly what they had discussed and the overall 56 pounds being the two pounds from the first transaction and the 54 from the second transaction.
Q. Okay. So was it your -- of course, I going to ask it. I invite the defense to object.
But based on all of this, did you make the conclusion, the law enforcement decision, that you had probable cause to not only arrest Mr. Olalde but to search his vehicle?
A. Yes.
Q. Independently of a dog sniff and a subsequent traffic stop?

A. Yes, we requested Trooper Mains to make a pretextual stop in order to protect the ongoing investigation and protect the CS. We already had PC.
Q. Okay. So in your view?
A. In my view, yes.
Q. And these pretextual stops are conducted by DEA for what purpose? You said it kind of --
A. Yes. So that -- when it's written up there's a valid reason to stop the vehicle. So when it's written up by the trooper it's not -- the defendants don't know that there's an ongoing DEA investigation occurring.
Q. And that was also -- explains why you weren't present at the scene --
A. Correct.
Q. -- of the arrest?
A. Yes, no.
Q. Okay.
A. -- yep the trooper.
Q. And the fact that during this stop and the search and the arrest there were any federal agents present until the end?
A. Correct. Because in addition to that, Mr. Marin-Gamino did state that he was going to go to the Hy-Vee, so we were anticipating his arrest. So a lot of the focus at that point was on Mr. Marin-Gamino and the troopers who were

handling Mr. Olalde-Nieves.

Q. At what point did you -- you've reviewed the videos, the squad car -- or the body camera videos or no? Okay. I'll save that for Trooper Main [sic].

MR. HOLLENHORST: That's all I have, Your Honor.

THE COURT: All right. Thank you, Mr. Hollenhorst.

Mr. Arneson, whenever you're ready.

MR. ARNESON: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. ARNESON:

Q. Good morning, Agent.

A. Good morning.

Q. All right. So it looks like -- correct me if I'm wrong, CS1 had already conducted a controlled buy from Mr. Marin-Gamino, correct?

A. Correct.

Q. But on this date, on the August 22nd, you had the CS make plans to do a purchase but you never intended to go through with that purchase?

A. So CS1, we had the transaction in June. Then CS2 got in the picture. They did the initial two-pound drug transaction and then followed up on August 22nd with the larger 54 transaction.

Q. Correct. But that day were you planning on having CS2

actually complete the purchase?
A. We had him -- him/her, him or her coordinate it. It was -- the intention was never for that CS to be present.
Q. Okay. Because -- well, let me back up.
A. Okay.
Q. So on August 22nd it looked like you had a team in place; is that correct?
A. Yes.
Q. Who all was on that team?
A. I would have to look back at my reports. I don't have -- DEA was there. Anoka County. We have Anoka-Hennepin County Drug Task help, we have Dakota County help and the troopers.
Q. Okay. Well, who -- do you know who from the DEA was on your team that day was helping out?
A. I'd have to look back at the report who was exactly was present. I know who -- I could tell you specifically who was watching the lot. Short of that, I'd have to look back.
Q. Okay. No problem. And then you stated that -- I know I believe that the transaction was arranged around 1:00 p.m. that day; is that correct?
A. We established surveillance starting at 8:45 a.m. When the initial conversation started, I didn't have that exact time, I had -- the first where I started noting that I, from my notes, put down the time was 12:58 when the text went

out. There was communication before that, I just didn't have the specific times.
Q. Okay. But roughly at 12:58, that's when the communication -- the plan was set up to meet at that gas station in approximately 52 minutes; is that right?
A. Yes.
Q. Okay. So, when that was set up, what did you do once you learned about that gas station, that they were going to meet? Who did you contact?
A. Our team -- we sent a unit from our specific team, which was TFO Valerius, set up and set up at the gas station for surveillance.
Q. Okay. And then I think you said it was always the plan to have the cop car roll in there around 3:00; is that correct?
A. Yes. It became part of the plan. It wasn't -- as the day went on, that became the plan to --
Q. Okay.
A. -- in order to get the vehicle to move.
Q. I see. And then I believe you stated that this -- all this was just happening over the air on the radio, so any law enforcement agent could hear -- listen in to it?
A. We have a reserved specific channel for our group and the troopers were on that also.
Q. Okay. So you contacted them and told them to turn it to

that channel?
A. Correct.
Q. Okay. And then you watched my client at the gas station and then when he left I believe you stated that you contacted Trooper Mains; is that correct?
A. I believe it was -- I'm not 100 percent sure if it was me specifically or if it was over the radio, it was communicated to him. I'm not 100 percent sure if I was specifically the person.
Q. Okay. And then I think you said that he doesn't put any of that in his report so that the defendants won't know there's a larger operation; is that correct?
A. Correct.
Q. But you didn't put any of this in your report. Why don't you put that stuff in your report?
A. Everything's in my report.
Q. Do you put in your report that you had contacted the troopers or that you had done anything with the troopers?
A. Oh, no, I did not.
Q. Okay. So your report doesn't have any information about the troopers until after they got involved?
A. Correct.
Q. Okay. And why is that?
A. Just common practice.
Q. But you list the agents that you sent places to do

surveillance on the gas station?
A. I do discuss what troopers made the stop in the report, so I do address them in the report.
Q. Okay. But you don't put any of the -- I guess that's part of my motion is that I didn't have any knowledge that you two had communicated. There's nothing in your report or the troopers' reports or the troopers' body cam, squad cam, there's nothing showing in that communication. So that's just why I'm trying to clear up when it happened.
A. Oh, it was planned beforehand.
Q. Okay.
A. We knew that we were going to likely initiate a traffic stop, so they were in the plan from the very beginning.
No, we don't put that in there because, like I said, initially we want it to look like two separate things.
Q. Correct. I understand the troopers' reports. I just didn't understand your report. Why you had put other agencies that you had worked with and other troop -- other law enforcement and where you sent people, just there's no mention of the troopers in your report?
A. I believe it does discuss that Trooper Mains made the stop.
Q. Correct. After the fact, correct?
A. Yes, but that's the same as when I set up surveillance,

I don't say upfront all these people are involved but I say what they're doing at the time that they're doing it.

Q. Correct. All right.

MR. ARNESON: Thank you. No further questions, Your Honor.

THE COURT: Thank you, Mr. Arneson.

MR. HOLLENHORST: No further questions, Your Honor.

THE COURT: All right. Agent Gerten, you're dismissed. Thank you.

THE WITNESS: Thank you very much.

MR. HOLLENHORST: Your Honor, the government calls Trooper Anthony Mains, M-A-I-N-S.

THE COURT: Thank you. Let me swear you in before you sit down, Trooper.

Do you swear or affirm the testimony you're about to give is the truth and the whole truth?

THE WITNESS: Yes.

THE COURT: Okay. Please have a seat.

And if you could state your name and spell your last name for the record.

THE WITNESS: My name is Anthony Mains. Last name M-A-I-N-S.

THE COURT: Thank you.

Mr. Hollenhorst, whenever you're ready.

MR. HOLLENHORST: Thank you, Your Honor.

**(Anthony Mains)**

**DIRECT EXAMINATION**

BY MR. HOLLENHORST:

Q. Mr. Mains, where do you work?

A. With the Minnesota State Patrol.

Q. And what did you do there?

A. I'm a State Patrol Trooper assigned to our canine unit.

Q. Okay. So sometimes you travel with a dog, sometimes not?

A. Correct.

Q. Okay. So on August 22nd, 2024, did you have your dog with you that day?

A. I did.

Q. Okay. But, yeah, that -- your dog was not deployed on that date; is that right?

A. Correct.

Q. Okay. So then another Trooper's dog was deployed and we're going to talk about that later, right?

A. Yes.

Q. All right. So how -- so we are talking about the events of August 22nd, 2024.

What was your involvement that day?

A. I was contacted by the DEA and was asked to conduct a traffic stop on a vehicle pertaining to one of their

investigations.
Q. Okay. Did you have some advance notice of this or did it just all of a sudden happen?
A. I had advanced notice, but a few hours.
Q. Okay. And did you communicate with Special Agent Connie Gerten in connection with this case?
A. I did.
Q. All right. Did she kind of explain to you what was going on and why there was a need to stop a vehicle?
A. She did.
Q. Okay. And what was her explanation as to why they wanted you to stop the vehicle?
A. She briefly told me about her investigation and base -- it was a very brief conversation as far as the details of the investigation, but just told me she needed help stopping a vehicle pertaining to a drug courier --
Q. Okay.
A. -- in Brooklyn Park.
Q. So it was your understanding then that this courier, as you described him, would likely be transporting drugs?
A. Yes.
Q. Okay. Did you in fact make a traffic stop of the defendant's vehicle that day?
A. Yes.
Q. And is it correct that he was driving a Chevy Malibu?

A. Yes.
Q. And it had license plate KPN654; is that right?
A. Yes.
Q. Does that sound right?
A. Yes.
Q. Okay. So why don't you describe in as much detail as you can recall as to how the stop went down?
A. I was set up on a side street off of Zane Boulevard on the northbound side. I observed the brown Chevy Malibu traveling northbound on Zane. The driver was slightly leaned over, like forward towards the steering wheel. I saw that the -- there was no belt stretched across his chest and it was pretty easy to tell. The belt was dark, he was wearing a bright yellow vest and the belt buckle was hanging on the B-pillar.
Q. Is that a violation of state law to not wear a seatbelt while the vehicle is traveling?
A. It is.
Q. At least for driver, correct?
A. For all occupants.
Q. For all passengers?
A. Yep.
Q. And so did that provide you with a basis to make the stop?
A. Yes.

Q. What time, approximately, did you make the stop?
A. I couldn't tell you the exact time, it was late afternoon.
Q. Okay. Your report says at 15:12 hours your attention was drawn to that Chevy Malibu. Does that sound about right?
A. Yes.
Q. Okay. So let's just jump ahead a little bit.

The occupant, the driver and sole occupant of the vehicle was later identified as Raymundo Olalde-Nieves, correct?
A. Yes.
Q. And do you see that person in the courtroom today?
A. I do.
Q. Could you point to him and identify him?
A. The gentleman sitting to the right of his attorney -- or sorry, to the left of his attorney, wearing the Minnesota Gopher pullover.

MR. HOLLENHORST: Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT: It will reflect that.

BY MR. HOLLENHORST:
Q. So I kind of interrupted you. You made a decision then to make a traffic stop?
A. Yes, sir.

Q. Okay. And you had been told moments before your observations of this Chevy Malibu going by that that was your time -- your time to make the stop, right?
A. Yes.
Q. Okay. All right. So what happened then as you pulled the vehicle aside?
Tell us in some detail what happened.
A. Prior to -- so I pulled out in the vehicle, it then signaled that it was going to make a left-hand turn into the Edinbrook Elementary School.
Q. I guess I was confused there. Who made the signal?
A. Raymundo.
Q. Okay. You say he put on his -- you pulled up behind the vehicle?
A. Yes, on Zane Boulevard and then he pulled -- he took a left-hand turn into the parking lot for an elementary school.
Q. Okay. But you activated your emergency siren and lights or no?
A. He was signaling to make that turn prior to that.
Q. Okay. All right. And how much time passed from the time that you believe he noted your presence and until the time he pulled over? Tough question.
A. 15, 20 seconds.
Q. Okay. So it's not like he was trying to evade a traffic

stop --
A. No.
Q. -- in all fairness, right?
A. No.
Q. So he pulls into this -- the Edinbrook Elementary School parking lot; is that right?
A. Yes, sir.
Q. What happened then?
A. The car came to a complete stop and I made a driver's side approach --
Q. Okay.
A. -- to make contact with Raymundo.
Q. What happened -- what happened then?
A. Immediately I thanked him for finally putting his seatbelt on.
Q. And he had put his seatbelt on?
A. Yes.
Q. Did you see him -- do you think you saw him putting his seatbelt on as the stop was ensuing?
A. Yes.
Q. Okay. Describe that a bit.
A. He was kind of doing -- as I was kind of walking up, he was, like, slightly moving his arm towards where the buckle would be.
Q. Okay. And this was after the stop and as you were

approaching the car?
A. Yes.
Q. Okay. So then what happened?
A. I told him for the reason of the stop and immediately had noted that he was breathing very heavily.
Q. In fact, you -- and the Court is going to see your squad car -- or rather your body camera video with all of this, so that's why I'm not going to cover in too much detail because it's all documented with your body camera; is that right?
A. Yes, sir.
Q. And at some point you tell him that, Man, you're really nervous. You're, like, calm down; is that right?
A. Multiple times, yes.
Q. Yeah. And, I don't know, if you can describe the level of nervousness, if that's even possible, but you've made a lot of traffic stops before, right?
A. Yes.
Q. So how would you describe it?
A. It was probably honestly the most nervous I've ever seen someone.
Q. Okay. And people get nervous for various reasons. Some people are just nervous when they see a police officer, right?
A. Correct.

Q. And you were in uniform?
A. Yes.
Q. And people get nervous for other reasons, too.
What are some other reasons, in your experience, that people get nervous about?
A. That they're involved in criminal activity.
Q. Okay. And that the police are investigating them?
A. Yes.
Q. Which would likely lead to their arrest?
A. Correct.
Q. Okay. And you've seen that before in your law enforcement experience as to why people can sometimes get very nervous?
A. Correct.
Q. All right. How long have you been a traffic cop?
A. 13 years.
Q. How many stops have you made in your career?
A. Thousands.
Q. Thousands?
A. Yep.
Q. Okay. And were a lot of those -- did a lot of those result in the seizure of contraband?
A. Yes.
Q. All right. Let's continue on then.
He's very nervous. You tell him that. What did

you do with -- what did he do and what did you do?
A. Just normal conversation. Asks where he was coming from, going. He said he was coming from work and he was going to visit his compadre.
Q. Okay. Was there anything suspicious about that?
A. The fact that he was turning into the school prior to me activating my lights maybe -- backing up a little bit, the school was not in session, there was no kids there, so there shouldn't have been anyone at the school.
Q. So you were led to believe that then he started pulling in there before --
A. It was almost simultaneously --
Q. Okay.
A. -- that he was pulling into that lot as my lights went on.
Q. What was suspicious about that?
A. It just seemed like he was trying to create distance between himself and a squad car.
Q. Okay. Well, just continue.
A. So --
Q. So there were some other things said that aroused your suspicion?
A. Yeah. So when people are involved in criminal activity they'll commonly make several left-hand turns or what we refer to as "heat laps" to make sure they're not being

followed in the hopes that we just continue straight.
Q. Okay.
A. And they'll turn into random parking lots or random businesses.
Q. All right. I'm beginning to understand.
So you had not activated your lights or siren at that point?
A. As he was making that turn into the lot, that's when I activated my lights.
Q. Okay. But your thought was that before you activated your lights and siren, that he had started to turn?
A. Correct.
Q. Okay. And that aroused your suspicion because you believe that that's a sign that when somebody sees a police officer's car behind them that they want to do things to avoid the police officer?
A. Yes.
Q. Is that what you're saying?
A. Yes.
Q. Okay. And that -- okay. Well, that puts in perspective a little bit more about what you're saying, so, but how did that conversation develop?
A. So he said that he was going to visit his compadre and was pretty vague on -- I asked him where he was visiting him and just, I think he said like a street over there.

Q. He just pointed somewhere?
A. Like he said, the other street down there, or something like that.
Q. Okay.
A. And I pressed, like, so why did you turn into here? And then his story began to change in that he was going to Alphonsa Church to pick up his son.
Q. Is Alphonsa Church anywhere near there?
A. It's on the other side of town.
Q. Okay. So did that make much sense to you then?
A. It did not, especially since it didn't seem like he was making a U-turn when I was stopping him. And another -- he was also -- he also missed several opportunities to make a U-turn --
Q. Okay. And you got --
A. -- to go in the direction of Alphonsa Church.
Q. All right. So the defendant was wearing something a little unusual, wasn't he?
A. Yes.
Q. What was that?
A. It was a brand new High Vis traffic vest.
Q. Okay. Have you seen that before in drug cases?
A. Yes.
Q. Why don't you -- and did that have some significance to you?

A. Yes.
Q. Why don't you explain to the Court what that is.
A. So drug traffickers will commonly display props. These props can be traffic vests, hardhats, ladders, traffic cones, things of that sort of nature, to kind of blend in with normal working -- like working class traffic.
Q. Okay. So one might say, or argue, that, well, he's calling attention to himself because he's wearing a reflective vest; right?
A. Correct.
Q. But you think it's the other side of the coin?
A. Yeah, I think he's -- based on the couple observations I've made prior to that, me noticing the hardhat in his back window and him wearing a brand new, it looked untouched, vest, with the sudden turn into that closed school and his nervousness that started to -- I started to draw the conclusion that he was certainly involved in criminal activity.
Q. Okay. And you said that there was a helmet in the back?
A. Yeah, it was a brand new helmet.
Q. Okay.
A. It was displayed right in the back window.
Q. So I guess then that -- and I'm not the one testifying but I guess what I'm getting from this is you're saying that he would have some plausible deniability if he's stopped by

a police officer as to what he's doing?
A. Correct.
Q. Okay. Did he mention the vest or did he mention the helmet in the back at all during your questioning?
A. No.
Q. Okay. And so then how did the traffic stop ensue? What happened next?
A. I asked him for his driver's license, his insurance. He than began telling me that he's working on his driver's license and started looking for insurance and said that it wasn't his vehicle, and then I returned back to my squad car.
Q. And then actually on the video you can see that you're running the information concerning the car and you were also running information concerning Mr. Olalde too; is that right?
A. Yes, sir.
Q. And what did you determine based on that?
A. That he had a revoked driver's license.
Q. Okay. So he was not legally entitled to drive that vehicle; is that right?
A. Correct.
Q. And you also determined that that vehicle was not his vehicle?
A. Correct.

Q. Was there anything -- and he actually admitted that it was not his vehicle, correct?
A. Correct.
Q. And I think you said, though, that he had permission to drive the vehicle or something along those lines?
A. Yeah, he said it was, I believe his brother's.
Q. Did you have any information based on his interview with him that as to how you might locate the true owner of the vehicle?
A. I believe he said he was going to try to contact him.
Q. Did he ever contact him?
A. Not that I'm aware of, no.
Q. Was he permitted to contact him?
A. Yes. He had his phone throughout the stop.
Q. Okay. So now you've got a person who is not legal to drive sitting in a car that's not his and he's not able to contact the -- what he claims to be the true owner, correct?
A. Correct.
Q. Under circumstances similar to that, would that provide authority or justification to impound the vehicle?
A. Yes.
Q. Why?
A. The fact that he's not the owner so he can't legally purchase insurance for the vehicle and the fact that he is not a valid driver would not permit him to leave with that

vehicle.

Q. Okay. Was the fact that this car was also in a school parking lot a factor that would add to that determination?

A. Yeah, it wasn't parked legally either.

Q. So it's not -- I mean, perhaps if it had been parked at a meter out on the street it would be a different question, but here there was no legal basis for him to park in that lot?

A. Correct.

Q. Does the Minnesota State Patrol have an impound policy?

A. Yes.

Q. And is that marked as --

MR. HOLLENHORST: Your Honor, if I could go over here.

BY MR. HOLLENHORST:

Q. Is that marked as Government Exhibit 4, to your knowledge?

A. Yes, sir.

Q. Okay. And that describes that if a car is impounded, then it provide a requirement that you inventory the contents and use a particular form to do so; is that right?

A. Yes, sir.

Q. Now, in all -- as the Court will hear, that you didn't really -- you didn't necessarily conduct -- or impound and

conduct an inventory; is that right?
A. Correct.
Q. So what you did is ultimately the car was searched and you found drugs and whatnot. But I think the key question here is --
MR. HOLLENHORST: And, Your Honor, we are relying on inevitable discovery in this argument.
BY MR. HOLLENHORST:
Q. -- that had you not done anything else, had you not had a dog run in the car, had you just simply decided that's the end of this, would you still have impounded the car?
A. Knowing what I knew, yes.
Q. Would you have conducted an inventory?
A. Yes.
Q. And would you have used a form PS 01818 to log that inventory?
A. Yeah, that would be our custody tow sheet.
Q. But you didn't use one in this case?
A. We did a custody tow sheet after locating the narcotics.
Q. Okay. But when -- and then you're referring to Government Exhibit 5 when you say that, right?
A. Yes, sir.
Q. Okay. And so it's a little odd to me because I've seen a lot of things like this, it doesn't really say anything?

A. Right.
Q. It doesn't -- it has that a Chevy Malibu was towed, but then it has all sorts of other blocks. Property inventory, blank; attachments, blank; no signatures. So why is that?
A. So the property -- it's typically things of value to cover liability. So things such as laptops or jewelry, money, stuff of that nature.
In this case there wasn't anything of value inside the vehicle. Once we inventoried it, after locating the narcotics, it was mainly trash and -- trash and narcotics, obviously.
Q. But in any event, you weren't really required to conduct this inventory because your theory at the time, at least for conducting -- for doing what you did, was probable cause to search the vehicle?
A. Correct.
Q. Okay.
MR. HOLLENHORST: All right. I think I've beat that horse to death.
BY MR. HOLLENHORST:
Q. So then you do at one point say, and I think this is a magic moment in these kinds of cases, you say at one point, I'm not going to give you a ticket. Okay?
A. Correct.

Q. But thereafter, a dog was brought up and time had passed, so the original, at least pretextual, purpose of the stop had ended at that point because if you're not going to give him a ticket then normally you let a person go, right?
A. Correct.
Q. Why did you continue to advance the investigation?
A. Well, giving that -- the comment I made to him about not giving him a ticket was to try to calm him down. Like I said, he was probably the most nervous I've ever seen on a traffic stop, he was starting to sweat, breathing extremely heavy, his stomach was -- you could see his heart beat through his stomach, and it was to try to gage if that would calm him down or not and it did not.
Q. Okay. How much time passed from the time of the -- I mean, again, this is all displayed on the video, but approximately how much time from the time passed from the time that you made that statement, I'm not going to give you a ticket until the dog sniff?
A. A couple of minutes, maybe -- maybe 5.
Q. Okay.
MR. HOLLENHORST: All right. I think that's all the questions I have of the witness, Your Honor.
THE COURT: Thank you, Mr. Hollenhorst.
Mr. Arneson, whenever you're ready.

MR. ARNESON: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. ARNESON:

Q. Good morning, Trooper.

A. Good morning.

Q. All right. So I believe you stated that on this day you were contacted by the DEA and asked to help with the stop; is that correct?

A. Yes, sir.

Q. And that was a few hours before you conducted the stop?

A. About that, yes.

Q. And how were you contacted?

A. Telephone.

Q. Okay. And who contacted you?

A. Special Agent Connie Gerten.

Q. Okay.

COURT REPORTER: I'm sorry, Special Agent?

THE WITNESS: Connie Gerten.

BY MR. ARNESON:

Q. And what did she tell you about the investigation?

A. I don't recall the specifics, just that she had an ongoing narcotics investigation and that she had a drug courier in the City of Brooklyn Park and that they were going to be doing surveillance on that individual and needed help with the traffic stop shortly after.

Q. Okay. So you stopped the car roughly around 3:12; is that correct?
A. About then, yes.
Q. And what time do you think you got contacted by Special Agent Gerten?
A. It would have been early in the morning, probably around 8 or 9.
Q. 8 or 9 a.m.?
A. Yeah, I believe so, yeah.
Q. Okay. Did you talk to her again?
A. I honestly don't recall. I obviously did, just to let her know I was in the area. But I don't think of any significant conversation.
Q. Okay. How did you know where to go?
A. She told me.
Q. So at 8 or 9 a.m. she told you that address to go to?
A. She just told me to go -- that they were setting up in Brooklyn Park. Just the general area. And then I called her to let her know I was in the area and then I was directed to be on a certain radio channel, and then that's where I found out where to go.
Q. Okay. So you talked to her multiple times it sounds like?
A. Via radio indirectly, yes.
Q. Okay. I guess I'm trying to figure out when -- at 8 or

9 you just knew Brooklyn Park, correct?
A. In that general vicinity, yes.
Q. Fairly large area, correct?
A. Yes.
Q. Where did you go?
A. I believe when I -- because when I was coming from St. Cloud that day --
Q. Okay.
A. -- I believe when I got close I switched over the radio channel and got more details --
Q. Okay.
A. -- on where to go.
Q. But you also -- I think you stated that you contact Special Agent Gerten again when you got into the area?
A. Like I -- I believe so I did, yeah.
Q. Okay. And that was by phone?
A. Phone or radio. I honestly don't remember how I found out where to go.
Q. Okay. But at 8 or 9 you just knew Brooklyn Park but somehow by 3:00 you knew right to be kind of by that Edinbrook school?
A. Correct.
Q. Okay. And then I believe you say you were directed to be on a certain channel; is that correct?
A. Yes.

Q. Why didn't you put any of that in your report?

A. This -- it was a supplemental report. For their -- for a bigger investigation.

Q. I missed -- I'm confused a bit.

So your report is a supplemental report?

A. Yes.

Q. So that's why you didn't put it in here?

A. Correct.

Q. Do you indicate anywhere in your report that it's a supplemental report?

A. No.

Q. Okay. And then I believe we heard through Mr. Hollenhorst that you had stopped the vehicle. You believed him to be nervous; is that correct?

A. Yes.

Q. Had you ever met him before?

A. No.

Q. So you don't know if maybe he breathes fast and sweats on a daily basis?

A. I'd hope not, but correct.

Q. Okay. But it was your belief from all your traffic stops that he was extremely nervous?

A. Yes.

Q. And that he was he was wearing the High Vis driving -- was this a work truck?

A. No, it was a passenger car.
Q. Okay. And you think he did the High Vis vest in a passenger car to blend in?
A. Yes.
Q. Okay. And I believe earlier you stated that it was after you had stopped him you had noticed a High Vis vest, the hardhat in the back, his breathing, his nervousness that that's when you started to draw the conclusion that he was into criminal activity; is that correct?
A. Set aside from whatever I already knew, yes.
Q. Okay. Because earlier you stated that's when you started to draw the conclusion but now you're saying that that was -- what you meant was separate from what you already knew?
A. Correct.
Q. Okay. And what did you already know?
A. That he was a courier transporting narcotics.
Q. Okay. And I believe you stated that it was -- it would have been possible to impound the car; is that correct?
A. Yes, sir.
Q. But it was parked at a elementary school, correct?
A. Yes.
Q. And was this summertime?
A. Yes.
Q. Was the parking lot full of vehicles?

A. No.
Q. Buses coming and going, kids running around?
A. No.
Q. Was it summer break?
A. Yes.
Q. So the vehicle probably could have been left there; is that correct?
A. No.
Q. It could not have been left there?
A. No.
Q. Why is that?
A. For one, it wasn't parked illegally; and secondly, it would probably generate complaints.
Q. Okay. And I believe you stated that at this point Mr. Olalde-Nieves had his phone, correct?
A. He did.
Q. And he indicated that maybe he could call someone to come and get the car; is that correct?
A. I believe he did mention that, yes.
Q. So had he been able to call someone, wouldn't that have alleviated your complaints or any of your worries about the car being left in the parking lot?
A. Well, there's still no insurance. So regardless of someone being valid to come pick it up, they would have to -- the owner would have to show up with valid insurance.

Q. Okay. And I forget again, how did you know -- came to the conclusion that it had no insurance?
A. He couldn't provide any and then I believe at one point he mentioned that he's trying to get ahold of his brother who was the other than and never provided any indication.
Q. Okay. So he didn't -- you didn't know it didn't have no insurance, he just didn't provide proof of insurance, correct?
A. Unless we're provided with the document showing that vehicle is insured, there is no insurance.
Q. Correct. Now, I know things have changed, you know, in the past 20 years.
You're a trooper. Do you run into people now that just have their insurance just on their smartphone?
A. Yes.
Q. So is it possible he didn't own the vehicle, he may not have that proof on his phone. But the owner of the vehicle, had he had the chance to show up, may have been able to provide you and show you that in fact that the car was insured, correct?
A. Yes.
Q. Okay. Now, I just want to clear up. You didn't know that it didn't have insurance, he just was unable to provide proof of insurance?
A. Correct, unless we are provided it but -- unless we're

provided with that proof, we have to assume that there is no insurance.
Q. Correct. But had he been given the chance to have someone to come, perhaps the owner, had they provided proof of insurance, at that point could the car have been moved?
A. Correct, yes.
Q. Okay. But as we -- the Court will see, dog sniff search found some drugs, correct?
A. Yes, sir.
Q. What did you do once you found those drugs?
A. I informed Mr. Olalde-Nieves that he was under arrest.
Q. What did you do with all the drugs?
A. They were eventually handed over to the DEA.
Q. In fact, who did you call?
A. Brady Hoeft?
Q. And who was that?
A. He's a Special Agent with the DEA.
Q. Why did you call him?
A. I believe he was in the parking lot at that time.
Q. He was in the parking lot at the school?
A. Yes.
Q. So there was a DEA agent in the parking lot at the school while you were searching the car?
A. I believe so, yes.
Q. Did you ever contact Special Agent Gerten?

A. After the fact, I believe.
Q. Okay. But you didn't put that in your report either?
A. No.
Q. But you did put in your report you did contact Special Agent Brady Hoeft with the DEA correct?
A. Yes.
Q. Okay. And in that report you put, He agreed to meet me and take custody of the suspected narcotics. Correct?
A. Yes.
Q. But you just said he was already in the parking lot?
A. Yes.
Q. So why did you write that he agreed to meet you and take custody of the drugs?
A. It's a supplemental report to further their investigation and putting law enforcement sensitive information isn't practice for us.
Q. Okay. Where was he at in the parking lot?
A. That I don't know.
Q. Okay.
A. It is -- it's typical for when we do these stops that there's always cover for officer safety purposes.
Q. Okay. And then you just put in your report that he agreed to meet you just as a way -- it's just something you put in your reports, but that's not actually what happened; is that correct?

A. Not necessarily. I mean, he agreed to meet me and take the narcotics off my hands so I didn't have to log it into our evidence system.

Q. Okay. And then I believe you stated that after you had told Mr. Olalde-Nieves that you weren't going to give him a ticket for the seatbelt violation, that was just to calm him down?

A. In an attempt to calm him down.

Q. Okay. Did you have any intention of letting him leave it at that point? Like, could he have walked off?

A. No.

Q. But at this point you hadn't found any drugs, correct?

A. Correct.

MR. ARNESON: Thank you.

Nothing further, Your Honor.

THE COURT: Thank you, Mr. Arneson. Mr. Hollenhorst, any follow-up?

MR. HOLLENHORST: Just a couple of questions, Your Honor.

**REDIRECT EXAMINATION**

BY MR. HOLLENHORST:

Q. First of all, I forget to ask you, do you know that your body camera video has marked as Government's Exhibit 1 and already admitted by the Court?

A. Yes, sir.

Q. So you were wearing that during -- pretty much during all relevant times in the case; is that right?
A. Yes.
Q. The other thing is Brady Hoeft. He was part of this law enforcement team that was involved in this case, right?
A. Yes.
Q. And you are also part of the law enforcement team; weren't you?
A. Yes.
Q. And you didn't know everything about the investigation but you knew some of what was going on in the investigation, correct?
A. That's correct, yes.
Q. And other people knew other things, correct?
A. Yes.
Q. So it was kind of a compartmentalized, one person knows something, another person knows something else, but collectively the whole story is told, correct?
A. That's correct.
Q. All right. So you referred to a supplemental report. And this is your report, right?
A. Yes.
Q. So it doesn't really say "supplemental report" but what you mean by that, I think, is that it's a supplement to

other information already gathered by other people?
A. That is correct, yes.
Q. Why wouldn't you put in here that the DEA was conducting an investigation into known drug courier and we were asked to stop that courier. Why didn't you put that in there?
A. Because it's a ongoing investigation.
Q. Okay. So you were asked to write a "supplemental report" so as not to kind of let the cat out of the bag, right?
A. That's correct.
Q. Okay. And actually, during the time you were kind of investigating the traffic stop part of this, you discovered two more violations, right?
A. Yes.
Q. Not only was there a seatbelt violation but there was a driving without proper authority, no license?
A. Correct.
Q. You also -- it is a state offense, and I have to admit I know this firsthand, that you have to show proof of insurance, it has to be in the car or readily available while driving a vehicle; is that right?
A. Yes.
Q. And, in fact, there's a hefty little fine that goes along with no proof of insurance; is that right?
A. Yes.

Q. Even if you have insurance for the car?
A. That is correct.
Q. All right. It's like a $350 fine, right?
A. Correct. Unless you can prove within 10 days that you actually have it.
Q. All right.
MR. HOLLENHORST: I think that's all I have, Your Honor.
THE COURT: Thank you, Mr. Hollenhorst.
Mr. Arneson, anything to follow up on that?
MR. ARNESON: Just briefly, Your Honor.
THE COURT: Okay.

**RECROSS EXAMINATION**

BY MR. ARNESON:
Q. I just want to point, because we glanced over kind of quick, because I'm also familiar with the no proof of insurance; however, you did state that you are required to have proof of insurance when you're stopped by a vehicle, correct?
A. Yes.
Q. Unless, what happens within ten days?
A. You have to provide the court with proof that you had insurance that day to avoid that fine.
Q. Correct.
So while it is a law, there's also that carve-out

saying you may not have had it on you on that day or someone else was driving your car, the owner can go up within 10 days and prove that on the day of the stop, not 10 days later, that car was insured, correct?

A. Yes.

MR. ARNESON: No further questions, Your Honor.

MR. HOLLENHORST: No further questions, Your Honor.

THE COURT: All right. Trooper Mains, you are excused. Thank you.

THE INTERPRETER: Your Honor, would this be a good break for the interpreter?

THE COURT: You read my mind. Thank you.

I think it could take five minutes, five-to-ten minutes?

We'll take a short break, folks. We'll be in recess.

(Recess taken at 10:39 a.m.)

* * * * *

(10:46 a.m.)

**IN OPEN COURT**

THE COURT: Thank you. Please be seated.

All right. We are back on the record during our motion hearing here.

Mr. Hollenhorst, I think you had previewed that

you had one more witness for us this morning.

Do you want to call your next witness?

MR. HOLLENHORST: Yes, Your Honor. The government calls Trooper Patrick Beuning.

THE COURT: Okay. And Trooper Beuning, if you could come up and stand right next to the witness stand so I can swear you in before you start testifying.

Do you swear or affirm that the testimony that you're about to give is the truth and the whole truth?

THE WITNESS: I do.

THE COURT: Okay. Please have a seat.

And if you could state your name and spell your last name for the record, I'd appreciate it.

THE WITNESS: Patrick Beuning, B-E-U-N-I-N-G.

THE COURT: Thank you.

Mr. Hollenhorst, whenever you're ready.

MR. HOLLENHORST: Thank you, Your Honor.

**(Patrick Beuning)**

**DIRECT EXAMINATION**

BY MR. HOLLENHORST:

Q. Where do you work, Mr. Beuning?

A. Minnesota State Patrol.

Q. And what do you do there?

A. I'm a state trooper.

Q. How long have you been a state trooper?

A. 12 years.
Q. Are you also a dog handler, a canine handler?
A. Yes.
Q. And your dog's name is?
A. Frizko.
Q. Were you on duty on --
THE COURT: Would you mind spelling that for our court reporter?
THE WITNESS: Frizko is F-R-I-Z-K-O.
BY MR. HOLLENHORST:
Q. And Frizko is spelled -- speaks Belgium -- or no, Flemish I guess it would be?
A. A combination of a lot of things.
Q. Okay. So, I mean you can hear -- there's a body camera here that's marked as Government Exhibit 2, you understand that's your body camera?
A. Yes.
Q. And you are speaking a foreign language to that dog?
A. At times, yes.
Q. Yes, okay. Like "zits"?
A. Yep. That's it. Put him in a sit.
Q. Yeah.
A. And just a few commands.
Q. Okay. Well, let's talk a little bit more about Frizko.
A. Okay.

Q. So the Court has heard testimony along these lines many times so we have to develop a record. So just for a couple of minutes, what is a canine narcotics dog?
A. So Frizko being a single purpose narcotics dog is simply trained to smell odors of narcotics. He's trained on cocaine, heroine, methamphetamines and then crack cocaine or derivatives thereof of those drugs.
Q. Okay. Are dogs particularly suited to sniff out these substances?
A. Yes.
Q. How so?
A. Their olfactory or their smelling capabilities are hundreds of times greater than humans and they're able to smell these odors that we can't smell ourselves.
Q. Okay. So hypothetically, if there's a bag of methamphetamine in the front seat of the car, the windows are open, the wind is blowing and the dog is on the leeward side of this whole scenario, can a dog pick up a scent of those drugs in a car?
A. Yes.
Q. Okay. And we're going to get to more specific information about that later, right?
A. Yes.
Q. All right. So how are these -- these dogs are obviously trained to do what they do, correct?

A. Correct.
Q. How are they trained?
A. So all our dogs for the state are purchased as green dogs. Generally we'll go out to a vendor in Pennsylvania, we'll select the dogs from there.
Q. And a green dog is like a new --
A. Yes, untrained at that time.
Q. Okay.
A. We'll bring them back. We have in-house trainers that are employed by the state and then they'll put those dogs through a course or a certification and then train them to then smell the narcotics.
Q. Okay. And certain records are kept concerning this training?
A. Yes.
Q. And then is it true also that dogs have to go -- and their trainers -- or their good shepherds have to go through a certification process?
A. Yes.
Q. Are there some particular agencies that certify the dogs and their handlers?
A. There are.
Q. What are those --
A. So originally with our agency, once a handler goes through a course with their new partner or dog they'll be

certified in-house through the state patrol by our certified trainers. And then we are also certified annually through the North American Police Dog Association, and we do that annually.
Q. Am I correct that Frizko was originally assigned to Trooper Douglas Rauenhorst?
A. Correct.
Q. And then he assumed higher duties at the Minnesota State Patrol?
A. Yes.
Q. Gave up the dog and now you have the dog, right?
A. Yes.
Q. And my understanding is also is Frizko is now retired?
A. Doug is retired.
Q. Oh.
A. Frizko is not retired.
Q. Oh.
A. Frizko's only -- Frizko's about five.
Q. Oh, okay. So as part of the discovery in this case, you provided us with some documents and records concerning the dog and we have turned that over to the defense. But one part of that was for training records and deployment records; is that right?
A. Yes.
Q. And do you keep a pretty good accounting of when the

dogs are deployed and the training that they've done and all that sort of thing?
A. Yeah, so anytime we partake in training with the dog or deployment roadside, everything's documented in software, so that way if things do come into question for trials, court purposes, anything like that, we maintain all those records and they're able to submit them.
Q. And I haven't marked those training records as an exhibit but they exist and you keep tabs on this; is that right?
A. Yes.
Q. But what I have marked as an exhibit is Government Exhibit 3, which are these certifications; is that right?
A. Correct.
Q. And I've marked four of them, two with Douglas Rauenhorst, and then your first one is the Minnesota State Patrol certification you referenced?
A. Yes.
Q. Dated February 7th, 2024. So that certification was six or seven months before the events of this case, right?
A. Correct.
Q. And then we've also got a certification that occurred occurred on October 2nd, a couple months after this?
A. That would have been -- as him and I would have been our first NAPA Auto certification together.

Q. Okay. So these dogs make mistakes, right?
A. Yes.
Q. Okay. What kind of mistakes do they make?
A. Generally low -- mistakes are low, I would say, but they -- we do have falses, whether it be in training or roadside. Generally falses in training would be the dog is going to -- what we call an alert or an indication on something where there isn't an odor placed.

Roadside it's possible to be a false too. Generally we look at those a little bit differently because we can't say there hadn't been something in the car the dog is smelling or possibly there's something in the car that we didn't find.

But, yes, they make mistakes no different than we do.
Q. How does Frizko rank in all the dogs that you're familiar with? Good, bad, the same?
A. So Frizko's the fourth dog that I've ran, the third one that I've certified with. He is the top dog that I had of the four.
Q. Okay. So the dogs aren't infallible but Frizko's pretty darn good?
A. Correct.
Q. Okay. So you mentioned already a couple terms and I know there's some confusion here. I'm sure the Court

isn't confused but I have been at times.

The terms "alert" and "indicate," what are those?

A. So an "alert," if I'm going to use the -- the definition would be a change in body posture or increased respirations when the dog first encounters or encounters the odor that he or she is trained to detect.

The "indication" is a trained response that is -- the dog is trained to do when they believe they're at the source of that odor.

So generally for our dogs their indication is a passive indication. So the dog will sit or lie down then at what they believe the source of the odor is.

Q. Okay. So the indication occurs when the dog at least believes it has identified the precise source of that substance?

A. Yes, or is as close as it can possibly get to that odor.

Q. Right. And the alerting is more, okay, there is a scent here but I'm not quite sure where that is?

A. Yes.

Q. Is that accurate?

A. Correct.

Q. Okay. So one of them is kind of heavily dependent upon your observations of how the dog is behaving, that's the

alert, right?
A. Yes.
Q. The indication anybody can figure that out because if the dog does what it's trained to do -- I mean, and the Court will see in this video that the dog did at one point near the end indicate by sitting, right?
A. Yes.
Q. Okay. All right. Well, I think I've covered all that.
So, you showed up at the scene of the traffic stop of the defendant on August 22nd around 3:15 that afternoon?
A. Yes.
Q. And you were working in tandem with the person who just testified, Trooper Anthony Mains?
A. Correct.
Q. So at some point you were asked to run your dog around this car, this Malibu, the Chevy Malibu; is that right?
A. Yes.
Q. And the time clock on the videos are fairly accurate, I believe, and so the Court can and the parties can determine later on in briefing when certain things happened, right?
A. Yes.
Q. Okay. But your dog search was done maybe, what, ten minutes after you got there, roughly?

A. Yeah, I think based off my body cam footage it was about 22 minutes and I think -- when I --
Q. Okay.
A. -- when I got him out of my car.
Q. Yes. Okay. And tell us just briefly how that dog sniff is typically done and then how it was, in fact, done on this date?
A. So typically I'll retrieve my dog from the rear of my squad, put his leash on, then I'll walk to the front of the vehicle that I'm going to sniff with him.
We'll proceed to the front of the vehicle, that's generally where we start. I'll place him into a sit by giving his command "zits," put him into a sit and then I'll give him another command, which is find your gift. I'm telling him to find his gift, that's him [sic] trying to tell him, hey, it's time to search. Let's go find your toy. They don't understand that they're necessarily searching for drugs. He thinks, oh, when I smell drugs I get my toy.
Q. Okay.
A. So I placed them into sit at the front of the vehicle. Give him his command, find your gift, and then we'll start working around the vehicle.
Q. All right. And so why do you use a foreign word?
A. I can't say why. That's what we've always done. It's --

Q. Okay.
A. So find your gift comes from what I think is Dutch or German Rauschgift. What the interpretation is, I don't exactly know.
But most of our dogs are imported or all of our current dogs are imported from Europe, so they might have been spoken to in a different language.
Q. I had heard from before and I think maybe even with respect to Frizko, that Frizko was actually born in Belgium?
A. So it's a Belgium Malinois.
Q. Oh.
A. I can tell you --
Q. No, that's okay.
A. I've got it in my pocket of where he was --
Q. It's not really relevant.
But they do receive some training before in Europe before they come over here or is --
A. Some dogs may. Whether Frizko did it or not generally --
Q. Okay.
A. -- like I said earlier, they're generally green dogs when we get them.
Q. Okay. So tell us then -- and then you run the dog around the car. And is it -- like, if you're from looking

from above down, is it a clockwise or counterclockwise?
A. Counterclockwise.
Q. Counterclockwise. Okay. And then you walk the dog around how many times?
A. It depends. So, usually two to three times.
Q. All right. Even if it's alerted or indicated?
A. A lot of times if it's alerted or indicated it will continue, because we want to get that dog to source.
If it's alerting, I'll go around more. If it's indicated already, then generally I won't continue.
Q. Okay. So indication, then again this trained response in this case to sit, that's pretty much it. The dog has found the source of the smell and it's alerted and done everything else, and that's the end usually, right?
A. Yes.
Q. And, in fact, in this case the dog did alert and that was when you stopped the dog's search, right?
A. He indicated.
Q. -- or indicated.
A. He alerted.
Q. I'm sorry. I used the wrong term.
He indicated and then that was the end of the search?
A. Correct.
Q. All right. So now the thing that by -- from a layman's

point of view that is troubling here -- and when the Court reviews this, I'm sure the Court will have the same response and I know the defense counsel has.

The dog -- you bring the dog out to the front of the car, right?

A. Yes.

Q. You have the dog sit?

A. Yes.

Q. You bring the dog in a counterclockwise fashion to the right front driver's window, right?

A. Yes.

Q. And what does the dog do?

A. Almost immediately goes and puts his head in the open window.

Q. Okay. So we're not conceding this, but for purposes of argument let's assume that that was an invalid search when a dog puts its head in the car. It's across the plane of the window, right?

A. Okay.

Q. Just assuming arguendo that that's impermissible --

MR. HOLLENHORST: Which we're not conceding at this point, Your Honor.

BY MR. HOLLENHORST:

Q. Do you feel that the dog had already indicated before that happened?

A. Alerted?
Q. Alerted!
A. Yes.
Q. Alerted.
A. Yes, I do.
Q. Okay. Now that you have to explain to the Court.
A. Okay.
Q. Tell us -- walk us through it.
A. So like I had said earlier, I'm bringing the dog to the front of the vehicle, place him in a sit.

On this certain case the wind was heavy from the south. We moved to the north side of the vehicle. So that wind is already pushing at us while we're at the front of the vehicle. So any odor that would have been coming from downwind is already was coming at us.

So when we start our counterclockwise pattern around the vehicle, we come up to the open window and you can see Frizko's head almost immediately comes up, he makes one hop and then, oh, he's smelling that odor already, and then he goes up to the window. He's telling me there, hey, I'm smelling something. I'm alerting. That's why I'm going to this open window. I'm trying to figure out where this odor is coming from.
Q. So, and as we stated -- as you stated a few minutes before, this dog's nose is very sensitive, right?

A. Yes.
Q. And you're saying that the wind from the south blowing through all four windows were open, right?
A. Yes.
Q. That wind, in combination with the open windows, can leave a trail of scent, a scent trail, so to speak, all the way to where you first had your dog sit?
A. Yes.
Q. And you're saying then that as the dog approached it basically was indicating or indicated moments before --
A. Alerting.
Q. Alerting! Alerting moments before it stuck its head in that car?
A. Yes.
Q. You can tell that I've had these terms confused all my life.
A. I'm here to help you, Tom.
Q. Okay. All right.
But then you continue. The dog then comes out, you walk it around and you walk it around I think two or three times, right?
A. Yes.
Q. And on other occasions it's -- it's still alerting?
A. Yes.
Q. And sticking its head in the window a couple times,

right?
A. Yes.
Q. Two or three times. Saw on the video, right?
A. Yes.
Q. And then finally, within maybe about a minute after a couple of passes, then it indicates?
A. Correct.
Q. Okay. So I guess -- and the indication, in your point of view, is now the dog pretty much knows where that scent is coming from?
A. Yes.
Q. But it isn't the trunk?
A. No.
Q. What do you think the dog was indicating for based on your knowledge and experience with the dog?
A. He was -- what he believed was the closest or easiest odor to get to.
Q. And was there methamphetamine found in the front seat right where the dog indicated?
A. Yes.
Q. How much?
A. I don't remember the total weight, 30-some grams or something.
Q. And the bag --
A. And paraphernalia too.

Q. Yeah, so like a bag of suspected methamphetamine?
A. Correct.
Q. All right. So based on your experience and training and the experience and training that your dog has had, at the moment before the dog first stuck its head in the window of the car, is it your opinion and your testimony that at that point the dog had alerted?
A. Yes.
Q. And an alert gives you probable cause to believe that there are narcotics somewhere in the vehicle, correct?
A. Yes.
Q. So after the dog indicated then you and your partner, Mr. --
A. Mains.
Q. -- Mains, then conducted a search of the vehicle, including a search of the trunk?
A. Yes.
Q. And the trunk was found to contain four barrels, five-gallon jugs, containing a lot of methamphetamine, right?
A. Yes.
Q. Okay. And then you said that you found methamphetamine in the front seat passenger side?
A. Yes.
Q. And then the drugs were eventually turned over to the

DEA?
A. Yes.
Q. Would you consider yourself to have been a member of the law enforcement team on this day?
A. Yes.
Q. You didn't know all the facts and circumstances, but you knew some of them, right?
A. Yes.
Q. You knew that, for example, that the defendant was suspected of being a drug courier?
A. Yes.
Q. In other words, you suspected that he was currently transporting drugs in his vehicle?
A. Yes.
Q. Okay.
MR. HOLLENHORST: Your Honor, that's all I have.
THE COURT: Thank you, Mr. Hollenhorst.
Mr. Arneson, whenever you're ready.
MR. ARNESON: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. ARNESON:
Q. Good morning, Trooper Beuning.
A. Good morning.
Q. And so I believe you say that Frizko is the fourth dog you've run, the third dog you've been certified with?

A. Correct.
Q. Okay. And you say that there are falses, that sometimes dog give false indications and alerts; is that correct?
A. Yes.
Q. And that you document each stop with your dog and keep a list of it; is that correct?
A. Yes.
Q. Do you know roughly how many times Frizko has given a false alert?
A. I do not.
Q. Okay. And so it's safe to say, so there's a different between an alert and an indication, correct?
A. Correct.
Q. An alert would be maybe something that maybe only you would notice?
A. Correct.
Q. Whereas an indication is something that the rest of us would notice?
A. Yes.
Q. So an alert is more of an art form just known between you and your canine partner?
A. Between the handlers and their partner, yes.
Q. Okay. And then you stated that you tell him "find your gift" and that that means for the dog that when the dog

smells drugs the dog gets its toy; is that correct?
A. Yes.
Q. So if the dog if it finds drugs gets a reward, correct?
A. Correct.
Q. So what happens if the dog doesn't find any drugs, is it punished?
A. It does not get -- no, it just doesn't get rewarded.
Q. Okay. Because in your video there's some sort of a toy, a stick or some sort of, like, a baton, correct?
A. Correct.
Q. And Frizko seems to love that; is that correct?
A. Yes.
Q. Okay. Is that what Frizko gets when Frizko finds drugs?
A. That or a ball, yes.
Q. Okay. And, in fact, I believe when Frizko -- when you first get him out of the back of your vehicle, does Frizko have that treat at that point?
A. I don't believe so, no.
Q. Okay. And then you went to the front of the car -- when you got Frizko out you went to the front of the car, correct?
A. Yes.
Q. And the wind was blowing. When you walk around the car, I know the dog is supposed to do certain things. Are you

supposed to touch the car?
A. We'll try to guide them to, hey, I want you to sniff here. Yes, we will touch a spot to say hey, I want -- we call it a presentation.
Q. Okay.
A. Generally on the first pass I'll do what's called a baseline, so I'll just have my hand down and just run a cursory around it and then once if we see an alert or something, then we'll go into that detailed -- or presentation pattern --
Q. Okay.
A. -- and show them areas we'd like for them to check.
Q. So Frizko knows to check where your hand goes; is that correct?
A. Correct.
Q. And you run your hand right across the window; is that correct?
A. Not immediately but later I did.
Q. Okay.
A. I don't believe it was the first pass but later passes, yes.
Q. Okay. And then after a dog alerts, if it's a strong enough scent, that's when they indicate; is that correct?
A. Yes.
Q. And you say the wind was blowing essentially from the

passenger's seat through the driver's seat, correct?
A. No, the wind would have been coming from trunk to the hood. It was a south wind so would have been pushing -- we started on the north side.
Q. I see.
A. So it was pushing the entire length of the vehicle.
Q. I see. So I was picturing the opposite way, I apologize.
So the wind was going from the trunk towards the hood, so not necessarily -- because were both windows down on the cab of the car?
A. Yes.
Q. But the wind wouldn't have been blowing through them, instead it would have been blowing along them; is that correct?
A. Yes.
Q. All right. So when Frizko jumped up and smelt, you think that he was smelling the drugs at that point on the floor of the passenger's seat at the window of the driver's seat?
A. I can't say he was smelling the drugs at the passenger floor or if it was the drugs in the trunk. He was smelling the odor he's trained to detect at that point.
Q. Okay.
MR. ARNESON: I guess that's all the questions, I

have. Thank you, Your Honor.

THE COURT: Thank you, Mr. Arneson.

Mr. Hollenhorst, any follow up?

MR. HOLLENHORST: No further questions, Your Honor.

I'll let the parties follow up but, Trooper, I just have one question or a couple of questions for you.

I think you started out by saying that there was 22 minutes between the time you arrived and the time that Frizko began the search. Did I hear that right?

THE WITNESS: Yes.

THE COURT: Okay. Can you help me understand what was happening during that time.

THE WITNESS: That was Trooper Mains was interacting with the driver at that point or running checks on him. I believe I went up at some point during there and spoke to the defendant and the passenger too while Mr. Mains -- Trooper Mains was running driver's license checks, vehicle checks and things like that.

THE COURT: Okay. Thank you. That's all I had.

Mr. Hollenhorst, any followup on that?

MR. HOLLENHORST: No, Your Honor.

THE COURT: Mr. Arneson?

MR. ARNESON: No, Your Honor.

THE COURT: All right. Trooper, you're excused.

THE WITNESS: Thank you.

THE COURT: Thank you.

(Off-the-record discussion.)

THE COURT: All right. Mr. Hollenhorst, I think that covers all the witnesses and exhibits that you had forecast for me. Anything else?

MR. HOLLENHORST: Nothing else, Your Honor.

THE COURT: All right. Mr. Arneson, anything further for the defense?

MR. ARNESON: No, Your Honor. Thank you.

THE COURT: All right. Well, so with that we will consider our evidentiary record closed.

Let's talk about next steps. I'm assuming that the parties are going to want to brief up the issues that were presented in the motion papers and the response, and what we had a little bit of a hearing about here today.

Typically I do two weeks so that we can get a transcript and then two weeks after that for a defense brief and two weeks for any government response?

Anyone want to try to talk me out of that?

MR. ARNESON: No, Your Honor.

MR. HOLLENHORST: No, Your Honor.

And am I to understand, two weeks for the transcript and then two weeks, so it's essentially four weeks?

THE COURT: Yes.

MR. ARNESON: Oh, I appreciate that. I'm in trial right now.

THE COURT: Oh, I didn't realize that.

MR. ARNESON: Oh, no, four weeks will be plenty fine, Your Honor.

THE COURT: Okay.

MR. ARNESON: Thank you.

THE COURT: Sounds good. That's what we'll do.

Sometimes those dates trigger from when you get the transcript, but I will just set a date certain for your brief that's two weeks, that's essentially four weeks from today.

MR. ARNESON: Oh, I could even make two weeks from today work, Your Honor. So I appreciate whenever the transcript comes in, I can get it done. Thank you.

THE COURT: Okay. Sounds fine. All right, folks.

And, you know, I'll tell you both. You can focus on what you want to but, you know, given the kind of waterfall of justifications from the government, one of the things, and I guess I'll direct this mostly to you, Mr. Arneson, and I'm not looking for you to comment or respond one way or another, but one of the things I was thinking about was to -- that to the extent that there's case law

from the Supreme Court and from the Eighth Circuit that kind of sets limitations on how long a person can be seized by virtue of a traffic stop, I'm not sure what the impact of that is on a vehicle search when that vehicle is independently stopped and then searched.

I'm not sure that cases like *Rodriguez versus Illinois* would extend to a vehicle that is immovable but you can tell me what you think about that. Okay. Other than that I won't tell you how to do your work.

All right, folks. With that, we're in recess.

(Court adjourned at 11:12 a.m.)

* * *

REPORTER'S CERTIFICATE

I certify the foregoing pages of typewritten material constitute a full, true and correct transcript of my original stenograph notes, as they purport to contain, of the proceedings reported by me at the time and place hereinbefore mentioned.

/s/Lynne M. Krenz
Lynne M. Krenz, RMR, CRR, CRC